AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Search Of The Cellular Device Assigned Call Number (937) 829-1012 And/Or The Use Of A Cell-Site Simulator To Locate The Cellular Device Assigned Call Number (937) 829-1012 | ) ) ) ) ) |

Case No.    3:20MJ136

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

### SEE ATTACHMENT A

This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A), and 2711(3)(A). Because the government has satisfied the requirements of 18 U.S.C. § 3122, this warrant also constitutes an order under 18 U.S.C. § 3123.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized):*

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud and Wire Fraud |
| 18 U.S.C. § 1347 | Health Care Fraud |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Pemberton, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence via facetime

*Judge's signature*

Date:    03/14/20

City and state:    DAYTON, OHIO

Hon. Sharon L. Ovington, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR DEVICE ASSIGNED CALL NUMBER (937) 829-1012 AND/OR THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICE ASSIGNED CALL NUMBER (937) 829-1012 | Case No.   3:20MJ136 **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Pemberton, Special Agent for the Department of Health and Human Services, Office of the Inspector General, being duly sworn, depose and state as follows:

## INTRODUCTION AND BACKGROUND

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) to authorize law enforcement to employ electronic investigative techniques, as described in Attachments B1 and B2, to determine the location of the target cellular device assigned number (937) 829-1012 ("Target Cellular Device"), which is described in Attachment A. The service provider for the Target Cellular Device is AT&T. This affidavit is made in support of up to two different search warrants to

1

locate the phone: (1) by obtaining information from the service provider, e.g., cell site information and (2) by utilizing a device that acts as a cell phone tower sometimes referred to as a Cell Site Simulator.

2.      I am a Special Agent with the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), assigned to the Detroit, Michigan, Field Office. I joined the United States Air Force in 1995 and served nearly 13 years on active duty. In 2000, I graduated from the Air Force Office of Special Investigations ("AFOSI") Academy at Andrews Air Force Base, Maryland. I was an AFOSI Special Agent for the last seven years of my Air Force career. From August 2008 to June 2015, I was a Special Agent with the United States Environmental Protection Agency ("EPA"). Upon becoming an EPA Special Agent, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center at Glynco, Georgia.

3.      I have been a Special Agent with HHS-OIG since June 2015. As a Special Agent with HHS-OIG, I am responsible for investigating violations of United States federal law, including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), Title 18, United States Code, Section 371 (Conspiracy to Pay and Receive Illegal Remunerations), Title 42, United

2

States Code, Section 1320a-7b(b) (Paying and Receiving Remunerations), Title 18, United States Code, Section 1035 (False Statements In A Health Care Matter), and 21 United States Code, Section 841 (Unlawful Distribution of a Controlled Substance). In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses, including at medical facilities, such as pharmacies, and individuals' residences.

4.     I have experience in the investigation, apprehension and prosecution of individuals involved in health care fraud offenses, the use of cellular devices to commit those offenses and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

5.     The facts in this affidavit come from my personal observations, training, experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     One purpose for applying for this warrant is to determine the Target Cellular Device's location. However, there is reason to believe the Target Cellular Device is currently located in the Southern District of Ohio because the user is known to live and spend most of his time in the Southern District of Ohio and the telephone area code number associated with the Target Cellular Device corresponds

3

to this district. Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that Kindy Ghussin ("Ghussin") has violated

a.  Title 18, United States Code, Section 1347, which provides that it is unlawful for any person to knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both;

b.  Title 18, United States Code, Section 1343, which prohibits wire fraud: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures,

4

or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both; and

 c. Title 18, United States Code, Section 1349, which provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. §§ 1347 and 1343.Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

 d. Title 21, United States Code, Section 841(a)(1), provides that it is unlawful for any person to knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

8. On or about March 12, 2020, in a sealed indictment, a grand jury in the Eastern District of Michigan charged Ghussin and five other individuals with conspiracy to commit health care fraud and wire fraud. As a result, Ghussin is the subject of an arrest warrant issued on March 12, 2020. In my training and experience, individuals generally keep their cellular device on or near their person. Thus,

5

locating the Target Cellular Device will assist law enforcement in arresting Ghussin, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

9.    In addition, on or about March 13, 2020, Magistrate Judge Hon. Sharon L. Ovington of the Southern District of Ohio issued a search warrant for Ghussin's cellular device that is the subject of this affidavit. Locating the Target Cellular Device will assist law enforcement in executing that search warrant.

10.    Because this warrant seeks the prospective collection of information, including cell-site location information, which may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. *See* 18 U.S.C. § 3123(b)(1).

11.    The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i); and/or is in a district in which the items described in Attachment A are stored, *see* 18 U.S.C. § 2711(3)(A)(ii).

## THE MEDICARE AND MEDICAID PROGRAMS

6

12.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are Medicare "beneficiaries."

13.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

14.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A. This investigation involves Medicare Part D, prescription drug benefits.

15.     A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network. When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan. The plan or PBM determines whether the pharmacy is entitled

7

to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan's sponsor reimburses the PBM for its payments to the pharmacy. PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

16.    CVS Caremark, OptumRx, and Express Scripts are three of several PBMs. CVS Caremark processes and adjudicates claims electronically in Arizona. OptumRx and Express Scripts process and adjudicate claims electronically outside the state of Michigan.

17.    Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

18.    By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act,

and applicable policies, procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

19. Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

20. Qlarant is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity Medicare Drug Integrity Contract ("MEDIC"). Qlarant's role is to detect, prevent, and investigate allegations of fraud, waste, and abuse in the Part C (Medicare Advantage organizations) and Part D (prescription drug coverage) programs on a national level.

21. The Ohio Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements and certain other individuals who lack adequate resources to pay for medical care. CMS is responsible for overseeing the Medicaid program in participating states, including Ohio. Individuals who receive benefits under the Medicaid program are also referred to as "beneficiaries."

22. Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by

9

Medicaid are reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

## SUBJECT PHARMACIES

### Heartland Pharmacy

23.    Heartland Pharmacy LLC ("Heartland") was a registered business entity with the Ohio Secretary of State. The following information is based on publicly available documents filed with the Ohio Secretary of State on Heartland's behalf. Heartland's Articles of Organization were filed on March 21, 2012 and reflect that Ghussin established the entity. Heartland's registered address was 3415 Riva Court, Beavercreek, Ohio 45430, which according to public records, including Ghussin's driver's license, is Ghussin's residence. Heartland's articles of organization list Ghussin as the statutory agent.

24.    An FBI agent and I reviewed September 2014, December 2016, and December 2017 Express Scripts provider certifications for Heartland, all signed by Ghussin, which listed the practice address for the pharmacy as 3000 Far Hills Avenue, Kettering, Ohio, 45429. According to that documentation, Heartland had been open since at least the end of 2012. The September 2014 and December 2016 provider certifications reflect that Ghussin, Abeer Rizek, Hassan Abdallah ("Abdallah"), and Raef Hamaed ("Hamaed") each owned 25% of Heartland. The

10

December 2017 provider certification lists Ghussin as a 34% owner, Abdallah as a 33% owner, and Hamaed as a 33% owner. All of the forms identify Ghussin as the pharmacist in charge ("PIC").

## Heartland Pharmacy 2

25.     Heartland Pharmacy 2, LLC ("Heartland 2") was a registered business entity with the Ohio Secretary of State. The following information is based on publicly available documents filed with Ohio Secretary of State on Heartland 2's behalf. Heartland's Articles of Organization were filed on June 7, 2012 and reflect that Ghussin established the entity. Heartland 2's registered address was 3415 Riva Court, Beavercreek, Ohio 45430, which, as stated above, is Ghussin's residence. Heartland 2's articles of organization list Ghussin as the statutory agent.

26.     An FBI agent and I reviewed a September 2014 Express Scripts provider certification for Heartland 2, which listed the practice address for the pharmacy as 2749 West Alex Bell Road, Moraine, Ohio 45459. According to that documentation, Heartland 2 had been open since at least approximately September 2012 and Ghussin, Abdallah, and Hamaed were each listed as owners. Ghussin was listed as a 33.34% owner, Abdallah was listed as a 33.33% owner, and Hamaed was listed as a 33.33% owner. Balhar Singh ("Singh") was listed as the PIC.

## 3415 Riva Court, Beavercreek, Ohio 45430

27.     According to Ohio Secretary of State driver's license records,

11

Ghussin's current address is listed as 3415 Riva Court, Beavercreek, Ohio 45430. A public records database search indicated that Ghussin's current address is 3415 Riva Court, Beavercreek, Ohio 45430.

## FRAUD SCHEME

28.     A common pharmacy fraud scheme is to bill Medicare, Medicaid, and other health insurers for medication that the pharmacy does not actually dispense to patients. Put another way, at a high-level, the pharmacy is submitting a higher volume of medication in claims to Medicare, Medicaid, and other insurers than it purchased during the relevant period; based on my experience and training, this is often referred to as a "shortage" scheme. This is indicative of fraud because a pharmacy cannot dispense more medications than it has purchased. Typically, although not always, Medicare and Medicaid pay significant sums for these "shortage" medications. For example, inhalers and pain creams are common shortage medications because insurers may pay hundreds of dollars for those medications. However, pharmacies can bill but not dispense any medication. Over the course of the last four-plus years I have investigated shortage schemes, I have interviewed many patients, who have told me that both expensive and inexpensive medications (ranging from inhalers like Advair, Symbicort, QVAR, Spiriva, and HIV medication to creams and other items) were billed to Medicare, Medicaid, and other insurers that they never received from a particular pharmacy.

29.    I will provide a simplified overview of how the shortage analysis is conducted to assist the Court in evaluating this search warrant application. In general, investigating a shortage scheme involves three steps: first, agents obtain a pharmacy's drug purchase records from pharmaceutical wholesalers. Agents identify wholesalers based on financial records for the pharmacy and its owner, which identify purchases from wholesalers, and submissions from the pharmacy to state regulators and PBMs about the wholesalers used by the pharmacies; second, agents obtain Medicare and Medicaid claims data for the pharmacy; third, agents request that Qlarant conduct a shortage analysis for the time period for which it has drug purchase records and claims data.

30.    Using the pharmacy's purchase records from the wholesalers and the claims data, Qlarant will pick a representative sample of prescription medications and compare the volume purchased with the volume dispensed in Medicare and Medicaid claims. Qlarant will then identify the volume of any shortage for each medication reviewed and the estimated amount that Medicare and Medicaid would have paid for medication billed but not dispensed. Because this analysis generally does not include claims data from any private insurers, the shortage amounts are conservative numbers because they do not incorporate any claims for that medication billed to private insurers.

31.    Based on the shortage analyses performed in this investigation, the

13

owners and operators of the aforementioned pharmacies fraudulently billed Medicare, Medicaid, and other insurers for medications that were not dispensed to beneficiaries. The pharmacies did not have sufficient drug inventory to dispense numerous expensive medications billed to Medicare and Medicaid.

32.     Pharmacies will also submit claims for medications disbursed to patients that post-date the date the patient died. Often, this is because the pharmacy has an automatic refill system in place that sends a claim to Medicare, Medicaid, and other insurers after a certain time period has passed since the prior fill of that prescription. However, whether a prescription is an automatic refill or not, if a patient does not pick up a prescription, the pharmacy is obligated to reverse the claim within a certain time. In my training and experience, pharmacies committing fraud often submit claims for beneficiaries who are already dead and never reverse them. The pharmacies involved in this investigation submitted post-death claims.

33.     The owners/operators of the aforementioned pharmacies submitted false and fraudulent claims through interstate wires from Ohio to Medicare and Medicaid. The claims were processed and adjudicated electronically by CVS Caremark, OptumRx, and Express Scripts, among other PBMs, outside the state of Ohio.

## PROBABLE CAUSE: FRAUD SCHEME

### Cooperating Witnesses

14

34. Cooperating Witness 1 ("CW-1") is known to agents. CW-1 pleaded guilty to conspiracy to commit health care fraud in the Eastern District of Michigan. CW-1 has not yet been sentenced. CW-1 owned a pharmacy and pleaded guilty stemming from a scheme in which CW-1's pharmacy billed for prescriptions that were not dispensed and paid kickbacks to induce beneficiaries to fill their prescriptions at CW-1's pharmacy. FBI and HHS-OIG agents in Michigan, including me, interviewed CW-1 in March 2017 and February 2020. CW-1 provided the following information based on conversations CW-1 had with Abdallah.

35. CW-1 knows Abdallah. They had multiple conversations, including some as recently as 2016, about their respective pharmacies and the fraud schemes they were each engaged in. Abdallah told CW-1 that Abdallah owned a pharmacy in Ohio that he had sold and another pharmacy that he opened in Ohio. An FBI agent and I reviewed records in this case indicating that Abdallah sold his interest in a pharmacy in Ohio in approximately 2012 or 2013 and subsequently opened Heartland and Heartland 2 with Ghussin and Hamaed.

36. Abdallah told CW-1 that Abdallah partnered with different individuals for his pharmacies, including Hamaed. Abdallah told CW-1 that Abdallah submitted claims for prescriptions that he did not dispense and submitted claims for automatic refills even if the patient did not want the medication. Abdallah stated that if his pharmacies were audited, he would be in trouble. Abdallah stated that he tried to

15

conceal his shortages by keeping enough inventory and invoices to cover an invoice review by the PBM for which the pharmacy billed through the most.

37.    Cooperating Witness 2 ("CW-2"), a relative of CW-1, is known to agents and pleaded guilty to conspiracy to commit health care fraud in the Eastern District of Michigan. CW-2 has not yet been sentenced. CW-2 owned a pharmacy and worked at a different pharmacy and pleaded guilty stemming from a scheme in which these pharmacies billed for prescriptions that were not dispensed and paid kickbacks to induce beneficiaries to fill their prescriptions these pharmacies. FBI and HHS-OIG agents in Michigan, including me, interviewed CW-2 in March 2017 and February 2020 and CW-2 provided the following information based on conversations CW-2 had with Abdallah.

38.    CW-2 knows Abdallah. They had multiple conversations between 2010 and 2014 about their respective pharmacies and the fraud schemes they were each engaged in. Abdallah told CW-2 that Abdallah partnered with different individuals for his pharmacies, including Hamaed. Abdallah told CW-2 that Abdallah submitted claims for prescriptions that he did not dispense and submitted claims for automatic refills even if the patient did not want the medication without reversing the claims. Abdallah stated that if his pharmacies were audited, he would be in trouble. Abdallah stated that he tried to conceal his shortages by keeping enough inventory and invoices to cover an invoice review by the largest PBM. He told his partners to do

16

this as well. Abdallah also stated that he closed and opened pharmacies on multiple occasions to avoid detection.

## Heartland

### Qlarant Invoice Reconciliation

39.     An FBI agent and I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Heartland, which are listed below. An FBI agent and I furnished all of the wholesaler records and Medicare and Medicaid data received to Qlarant and requested an invoice review for the period of December 4, 2012 through June 4, 2019. Qlarant compared invoices for Heartland's drug purchases to Medicare and Medicaid claims data for this period.

40.     On November 22, 2019, Qlarant provided the following summary of its invoice review:

**Wholesalers with Supportive Invoices:** Akron, Alpine, Anda, Auburn, Bonita, Cardinal, DTR Medical, Fagron, H&H Wholesaler, Health Source, Independent, Ixthus, Letco Medical, Masters, McKesson, Medmax, Miami Luken, Nephron, NuMed, Paragon, ParMed, Pharmsource, Praxis, Prescription Supply, PriMed, Redmond & Greer, Republic, River City, Smith Drug and Integral, South Pointe, Taiga, and Wasatch

**Date Range of Invoice Review:** 12/04/2012 – 6/04/2019

**Number of Drugs Reviewed:** 179

**Total Number of Drugs Short to Medicare:** 55

**Total Number of Drugs Short to Medicaid:** 4

17

**Approximate Loss to Medicare:** $661,857.23

**Approximate Loss to Medicaid:** $28,731.69

**Approximate Combined Loss to Medicare and Medicaid:** $690,588.92

41.　Qlarant provided the following summary of Heartland's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Novolog Inj Flexpen | $97,403.51 |
| Metformin Tab 1000 ER | $66,818.75 |
| Lantus Solos Inj 100/ML | $58,232.55 |
| Seroquel XR Tab 300 MG | $45,834.94 |
| Abilify Tab 10 MG | $45,275.24 |
| Budesonide Cap 3 MG DR | $29,617.53 |
| Abilify Tab 20 MG | $27,561.16 |
| Creon Cap 24000 UNT | $25,464.72 |
| Renvela Pow 2.4 GM | $24,067.49 |
| Humulin R Inj U-500 | $23,120.56 |

42.　In sum, Qlarant concluded that Heartland's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 55 of the 179 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Heartland approximately $690,588.92 for medications that Heartland did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Novolog Inj Flexpen, Metformin Tab 1000 ER, and Lantus Solos Inj 100/ML.

18

Beneficiary Interview

43.    In December 2019, An FBI agent and I interviewed S.H., a Medicare beneficiary who picked up prescriptions at Heartland. Claims data reflects prescriptions purportedly dispensed to S.H. from at least 2013 to 2018. S.H. identified Ghussin as the pharmacist and owner of Heartland. S.H. stated that s/he did not receive all of the medication that Heartland billed to his/her Medicare insurance.

44.    For example, S.H. only received Metformin Tab 500 mg ER from Heartland and stated that s/he never received Metformin Tab 1000 mg ER from Heartland. However, between September 2014 and February 2018, Heartland billed S.H.'s Medicare insurance for Metformin Tab 1000 mg ER approximately 15 times. Metformin Tab 1000 mg ER is one of the top shortage medications that Qlarant identified. S.H. surmised that Ghussin billed his/her Medicare insurance for Metformin Tab 1000 mg ER, but dispensed Metformin Tab 500 mg ER.

45.    As a second example, S.H. stated that s/he never received Chantix from Heartland because s/he was afraid to take Chantix due to already taking anti-depressants. However, between October 2016 and May 2017, Heartland billed S.H.'s Medicare insurance for Chantix approximately eight times.

19

## Heartland 2

## Qlarant Invoice Reconciliation

46.    An FBI agent and I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Heartland 2, which are listed below. An FBI agent and I furnished all of the wholesaler records and Medicare and Medicaid data received to Qlarant and requested an invoice review for the period of December 15, 2012 through June 4, 2019. Qlarant compared invoices for Heartland 2's drug purchases to Medicare and Medicaid claims data for this period.

47.    On November 22, 2019, Qlarant provided the following summary of its invoice review:

**Wholesalers with Supportive Invoices:** Alpine, Anda, Bonita, Cardinal/Harvard Drug, Fagron, Health Source, Ixthus, Keysource/ Praxis, Masters, McKesson, Miami Luken, Parmed/ Gensource, Pharmsource, Redmond and Greer, Republic, River City, Smith Drug and Integral, South Point, Taiga, and Wasatch.

**Date Range of Invoice Review:** 12/15/2012 – 06/04/2019

**Number of Drugs Reviewed:** 101

**Total Number of Drugs Short to Medicare:** 43

**Total Number of Drugs Short to Medicaid:** 4

**Approximate Loss to Medicare:** $378,885.27

**Approximate Loss to Medicaid:** $16,098.20

**Approximate Combined Loss to Medicare and Medicaid:** $394,983.47

20

48.     Qlarant provided the following summary of Heartland 2's top ten drug shortages by approximate combined loss to Medicare and Medicaid:

| Drug Name | Approx. Dollar Loss |
|---|---|
| Betaseron Inj 0.3 MG | $78,781.42 |
| Opana ER Tab 40 MG | $30,506.21 |
| Creon Cap 24000 UNT | $26,711.94 |
| Spiriva Cap Handihlr | $24,019.15 |
| Latuda Tab 40 MG | $23,005.97 |
| Latuda Tab 20 MG | $21,226.51 |
| Latuda Tab 120 MG | $18,745.35 |
| Lantus Solos Inj 100/ML | $16,544.91 |
| Lidocaine Pad 5% | $16,489.45 |
| Advair Disku Aer 250/50 | $14,624.75 |

49.     In sum, Qlarant concluded that Heartland 2's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 43 of the 101 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Heartland 2 approximately $394,983.47 for medications that Heartland 2 did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Betaseron Inj 0.3 MG, Opana ER Tab 40 MG, and Creon Cap 24000 UNT.

<u>Beneficiary Interview</u>

50.     In December 2019, An FBI agent and I interviewed C.M., a Medicare beneficiary who picked up prescriptions at Heartland 2. Claims data reflects

21

prescriptions purportedly dispensed to C.M. from at least 2013 to 2018. C.M. identified Ghussin as the pharmacist at Heartland and as a fill in pharmacist at Heartland 2. C.M. stated that s/he did not receive all of the medication that Heartland 2 billed to his/her Medicare insurance.

51.     For example, C.M. recalled that s/he received inhalers from Heartland 2, but only received one brand of inhaler in a given month. C.M. did not receive a Proair inhaler and a Dulera inhaler in the same month. However, C.M. was billed for both a Dulera inhaler and a Proair inhaler in March 2014, May 2014, June 2014, and July 2014.

## PROBABLE CAUSE: TARGET CELLULAR DEVICE

52.     Based on my training and experience, pharmacy owners, especially when multiple people own a pharmacy, use their cellular phones to conduct pharmacy business, whether by phone call, text message, email, messaging apps, or other apps. In addition, in my experience, conspirators in illegal fraud schemes utilize cellular telephones to communicate about the scheme. Further, based on my training and experience, I know that cellular phones can contain years of information, including information carried over from previous devices. This is particularly true with Apple cellular phones.

53.     On February 10 and 12, 2020 FBI and HHS-OIG agents in Michigan interviewed former Heartland and Heartland 2 Pharmacy employee, K.S. K.S.

provided the following information: K.S. worked at Heartland and Heartland 2 from October 2018 until June 2019, around the time the pharmacies closed. Ghussin told K.S. he had partners from Michigan for both Heartland and Heartland 2. Ghussin told K.S. his partners were causing him stress and that he could not make decisions without them. Ghussin spoke constantly about how he had to speak with his Michigan partners to make decisions regarding the pharmacies. Ghussin had long conversations on his phone about business and he was always texting. K.S. identified Ghussin's phone number as (937) 829-1012, which is the same as the Target Cellular Device. The toll records for the Target Cellular Device reflected 662 contacts with K.S.'s phone between October 10, 2018 and January 28, 2020.

54.     An FBI agent and I received wireless subscriber and toll records for the Target Cellular Device pursuant to a Grand Jury subpoena served on AT&T. A review of the subpoenaed AT&T records revealed the following: AT&T phone number (937) 829-1012 was assigned to IMEI number 353807084250860. The subscriber information for this cellular telephone number identified the financially liable party, billing party, and user information as Hartland [sic] Pharmacy, 3000 Far Hills Ave., Dayton, OH 45429. These records also indicated Hartland [sic] had been a customer since December 23, 2016.

55.     Agents obtained cellular telephone numbers for Abdallah, Hamaed, and Singh through reviewing records from cellular telephone providers, Medicare,

23

Medicaid, and PBM documentation, and public records. AT&T provided toll records for the telephone number (937) 829-1012 for the period January 1, 2012 to February 6, 2020. Ghussin's cellular phone (the Target Cellular Device) had 8,378 contacts with Abdallah's cellular phone number between January 7, 2012 and November 26, 2019; 1,216 contacts with Hamaed's cellular phone numbers between January 6, 2012 and June 4, 2019; and 1,105 contacts with Singh's cellular phone number between February 20, 2012 and December 16, 2019. Ghussin's cellular phone had 248 contacts with Heartland between September 28, 2012 and September 10, 2019 and 85 contacts with Heartland 2 between November 26, 2012 and May 2, 2019.

56.     An FBI agent and I received records from the Ohio Board of Pharmacy. The records included a September 1, 2017 email that Ghussin sent to a State of Ohio employee. The subject of the email was "Steve Hammond." According to Ohio unemployment insurance records, Hammond was a Heartland employee during this time. The email concerned an Ohio Board of Pharmacy inspection finding that one of Ghussin's employees did not have a proper background check completed as required by regulation. The email address used by Ghussin was drghussin@yahoo.com. The bottom of the email had the words, "Sent from my iPhone."

57.     Based on this information and my experience investigating fraudulent

24

home health schemes, there does exist, and I do believe there exists, probable cause that Ghussin is using the Target Cellular Device in furtherance of the conspiracy and that evidence or fruits or instrumentalities of unlawful conduct, including data, emails, voicemails and text messages, will be found on the Target Cellular Device.

58. Because the search warrant issued by Magistrate Judge Hon. Sharon L. Ovington in this District referenced in paragraph 9 must be executed within 14 days, monitoring the Target Cellular Device's over that period will enable agents to not only effectuate the search warrant but also to timely execute the above-reference arrest warrant when agents plan to arrest Ghussin's co-defendants on March 18, 2020.

## MANNER OF EXECUTION

59. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

60. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to

25

collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

61. To facilitate execution of this warrant, law enforcement may use an investigative device or devices (sometimes referred to as a Cell Site Simulator) capable of broadcasting signals that will be received by the Target Cellular Devices or receiving signals from nearby cellular devices, including the Target Cellular Devices. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target

26

Cellular Devices and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Devices and use that information to determine the Target Cellular Devices' locations, even if it is located inside a house, apartment, or other building.

62.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Devices, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Devices, and law enforcement will limit collection of information from devices other than the Target Cellular Devices. To the extent that any information from a cellular device other than the Target Cellular Devices is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Devices from all other cellular devices.

63.     Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of the Target Cellular Device, including by initiating a signal to determine the location of the Target Cellular Device on Target

27

Cellular Device's network or with such other reference points as may be reasonably available.

64.    Based on my training and experience, I know that AT&T can collect cell-site data about the Target Cellular Device. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

65.    Based on the foregoing, I request that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

66.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the

28

warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the target cellular devices would seriously jeopardize the ongoing investigation. Such disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is a reasonable necessity for the use of the techniques described. *See* 18 U.S.C. § 3103a(b)(2). As further specified in the attachment, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is a reasonable necessity for that seizure. *See* 18 U.S.C. § 3103a(b)(2).

67.    I further request all precision location information, E-911 Phase II data, GPS data, and latitude-longitude data.

68.    I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish

29

the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cellular Device on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

69. I further request, pursuant to 18 U.S.C. § 3123, the installation of a pen register and trap and trace device with real time cell site information, including all packet switched data, to monitor non-content signaling and routing information. I also request disclosure by the service provider all information necessary to implement the requested techniques, including subscriber information, extended subscriber information, handset information, and per call measurement data (PCMD).

70. Pursuant to 18 U.S.C. § 3123(b), the government requests that the pen register / trap and trace device be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the target cellular devices; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the target cellular devices; or any additional changed dialed

30

number, ESN, IMSI, or SIM listed to the same subscriber account as the target cellular devices.

71.    I further request that the service provider provide call detail records, including cell site location information, for the past thirty (30) days. 18 U.S.C. § 2703(d).

72.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the target cellular devices outside of daytime hours.

73.    I further request that the Court order all documents in support of this application, including the affidavit and search warrant, be sealed until further order by the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. I further request that the Court order any service provider, or their representatives, not to disclose the existence of this warrant or investigation unless ordered to do so by the Court.

74.    A search warrant may not be legally necessary to authorize all of the investigative techniques described. Nevertheless, I submit this warrant application out of an abundance of caution.

Respectfully submitted,

Michael Pemberton, Special Agent
HHS-OIG

Sword to before me and signed in my
Presence and/or by reliable electronic means

Hon. Sharon L. Ovington
UNITED STATES MAGISTRATE JUDGE

Dated:     03/14/20

32

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative techniques described in Attachments B1 and B2 to identify the location of the cellular device assigned phone number (937) 829-1012, whose wireless provider is AT&T, and whose listed subscriber is Heartland Pharmacy, which, as described in the Affidavit, was operated by Kindy Ghussin.

Records and information associated with the Target Cellular Device that is within the possession, custody, or control of AT&T.

This Warrant also serves as a Pen Register order under 18 U.S.C. § 3123. The Court makes the following findings: Kindy Ghussin is the person to whom the pen register or trap and trace devices are to be attached/applied and who are the subject of the criminal investigation; (937) 829-1012 is the phone number to which the device is to be attached; and Title 18, United States Code, Section 1347, Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1349, and Title 21, United States Code, Section 841 is the offense, or one of the offenses, to which information relates; and the attorney for the government has certified to this Court that the information likely to be obtained by the installation and use of the pen register or trap and trace device is relevant to an ongoing criminal investigation by the Federal Bureau of Investigation.

1

**ATTACHMENT B1**
**Particular Things to Be Seized**
**with a Cell Site Simulator or Wi-Fi Geolocation Device**

Pursuant to an investigation of Kindy Ghussin and other individuals for a violations of Title 18, United States Code, Sections 1343, 1347, and 1349 (wire fraud, health care fraud, and conspiracy to commit health care fraud and wire fraud) and Title 21, United States Code, Section 841 (unlawful distribution of a controlled substance), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular devices for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio signals emitted by the target cellular devices in response to signals sent to it by the officers;

for a period of thirty (30) days, during all times of day and night. This includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C. § 3123 by the Federal Bureau of Investigation. Because the use of the device, a Cell Site Simulator or Wi-Fi geolocation device,

may fall within the definitions of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the application and the warrant are designed to comply with the Pen Register Statute as well as Rule 41. The application therefore includes all information required for and serves as a pen register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Devices, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Devices, and law enforcement will limit collection of information from devices other than the Target Cellular Devices. To the extent that any information from a cellular device other than the Target Cellular Devices is collected by the law enforcement device, law enforcement will delete that information, and law

2

enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Devices from all other cellular devices

The Court finds reasonable necessity for use of the techniques and collection of information described. *See* 18 U.S.C. § 3103a(b)(2).

3

## ATTACHMENT B2
### Particular Things to Be Seized

## I.     Information to be Disclosed by the Provider

All information about the location of the Target Cellular Device described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cellular Device" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cellular Device on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

4

The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to Be Seized by the Government

All information described above in Section I that will assist in arresting Kindy Ghussin, who was charged with violating Title 18, United States Code, Section 1349, on March 12, 2020, is the subject of an arrest warrant issued on March 12, 2020, and is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).]

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

5